Good morning, your honors. May it please the court. My name is Richard Hammer. I proudly represent David Quatrella, the appellant. In my 44 years of having conversations with you, I'd like to discuss the emotion, pace, and tone that is not always in the dry record. In this particular case, as it relates to pace, the case when it warped speed from charge to sentence was only 145 days. This left the probation department breathless. It was hard to keep up and catch up with issues of stranger originated fraud, which is not your everyday type of case. In relationship to tone, I would say that previous counsel was flat every conceivable right. The actual questions before us concerned the loss calculation and whether the alleged victims were actually involved in the scheme. Is that right? Correct. And these are factual questions? Factual and legal, I think. Certainly intended loss would be at least mixed. All right. So whether the alleged victims were involved is reviewed for clear error. You agree with that? Well, I think that the victims' involvement is not so much a guideline calculation as a sentencing and restitution issue, your honors. Yes. But the question that's before us is would be reviewed for clear error. The question of, excuse me, the question that you raised relating to restitution would be reviewed for clear error, right? That would be correct. Okay. So why don't we get to those issues and discuss them? Sure. I think, your honor, if I had to bet the chicken ranch on five lines in the record below, it would be the appendix, page 76, which is page 7 of the sentencing transcript. The trial court, in evaluating the intended loss in the instant case, stated Mr. Quicella intended the fraud of $15 million, $10 million, and $10 million in the three face values. In the Second Circuit, we deal with subjective intent, not objective intent. The difference . . . But the factual argument you've been making is that, in the brief, is that the victims were in on the fraud and the district court concluded otherwise. So why was that finding clearly erroneous? Well, I think the finding was clearly erroneous because when I filed the Rule 35A motion to attack the sentencing, we immediately filed an affidavit indicating that these investors had been close friends, and most of them had been clients of Mr. Quicella for years. And we filed . . . That wouldn't be the first time somebody has cheated a close friend or a client. No, I'm sure it happens. Well, here there was an email sent reassuring these people that the policies were okay, notwithstanding problems that had surfaced. That's right. And that related to a Delaware finding, Your Honor. Right. That's very astute. But I think that shows the opposite, that because these investors who became informants were so aware of stranger-originated policies that they even rose the question . . . They rose the question of whether that's what this was, and they were told it was not. They were told that, in the opinion of the appellant, Mr. Quicella, they were not. But that is where the fraud is in the instant case with the insurance companies, that Mr. Quicella pled guilty to keeping from the insurance companies that this was stranger-originated. He in no other way . . . But he kept it from the investors, didn't he? No. The investors had every policy. The only evidence in the case . . . You could have a policy and not know that it's a stolen. Right. But the only evidence in the case as to the veracity of their knowledge comes from the affidavit that was filed in the 35A proceeding indicating that these close-knit family and friends were well-versed in stole-secondary policy since 2003. And . . . Is there . . . Could you point out the evidence that shows that they had ever bought something knowing that it was a stole policy? I think the affidavit clearly indicates that. The record otherwise . . . This is the affidavit of your client. It certainly is, Your Honor. Your client who apologized to those investors profusely when he was trying to persuade the district judge how remorseful he was. Yes. And I think . . . So is there not a credibility judgment that the district court is permitted to make in that circumstance? I think that's true, Your Honor. But also let's bear in mind that in the six weeks from the time that affidavit was filed indicating these were all sophisticated, stolen investors, that government didn't rebut that affidavit, nor . . . I'm not sure I understand. Can you point me to any place in the affidavit where it states that these investors bought policies knowing that they were stole policies? I would say that in the affidavit in the third section on paragraphs five and six, it states that in 2003, these investors met with these, you know, stole gurus. They use the premium finance language from 2003 on. It doesn't say that these investors bought eight stole policies, et cetera, et cetera. But the implication is there, and I feel that the government . . . You're saying that the judge should have drawn a different inference and made a different credibility judgment than the judge made. And we should say that that is so clear that the factual findings should be reversed. I believe that's correct because it's unrebutted. The other thing is that when we look at the government's conduct in this case, they promised Mr. Quintella in the plea proceedings that these folks would not . . . were not victims. Yes, but the government, which you accuse of rampant misconduct throughout and abuse of your client, first made a deal with him that limited his exposure below what everyone knew the sentencing guidelines would be, then agreed with him that they would not press for any restitution and any kind of loss, then stood by that agreement in the district court after it turned out that the victims were claiming that there was loss, then declined in this court to enforce the appeal waiver that your client entered into. This is the government that you are saying was unfair to your client? Yes, precisely. And the reason why, Your Honor, is because when a promise is made to a defendant that a group of people would not be victims . . . and all we have to do is look at this stipulation of facts, they were not victims. What the government is saying is the only reason they couldn't be victims is because they're participants under 3664A. I mean, that's the elephant in the room. I think everybody knew that these investors and their informants were participants. What everybody knew was that this stipulation did not bind the court. The government in the district court stood by its stipulation and declined to advocate for the restitution award. This was simply between the purported victims and your client, and the district court made a judgment about what the right answer was. Isn't that what happened in the district court? I respectfully disagree. If you look at the sentencing on page 34, 35, and 36, the government blasted Mr. Grutella in language that he egregiously lied to the victims. He swindled the victims. When the government makes a promise that they're not victims, and they use that kind of language to demand a three-year sentence from the court, and the court bases that sentence on the toxic letters that came in at the last . . . First of all, the government should have objected . . . Mr. Hammer. Yes, Your Honor. You've saved three minutes. Do you want to use it now, or do you want to leave it for the court? No, let's leave it. All right. Let's hear from the court. Thank you. Thank you. May it please the Court, my name is David Novick, Assistant U.S. Attorney in Connecticut. I was Mr. Perry's supervisor throughout the course of this prosecution, and I represent the government in this argument. Your Honors, defense counsel in this case, prior defense counsel in this case, took an entirely reasonable attack approach to defending Mr. Quatrella, and that is one that is tried and true. The defendant, seeing the facts as they were, counsel seeing the facts as And, in fact, as Your Honors have already pointed out, he received that. He received that in the form of a plea to a 371 charge, as opposed to the maximum available charge under the law. He received that, ultimately, in the form of an agreement by the government to recommend . . . actually, I should say recommendation, ultimately, by the government of a below-guideline sentence. And he received that, in fact, in getting a significantly below-guideline sentence in this case, in which the court took note of all of the evidence of Mr. Quatrella's contrition, including his apology to these investors that he is now complaining are, in fact, liars. What's going on here, Your Honors, is that the defendant now is unhappy with the sentence that he received, and so he is lashing out both at prior counsel, at the government, and for things that he cannot support, making allegations, Your Honor, that he . . . Your Honors, that he . . . that the government somehow hid facts or did not acknowledge facts that should have been obvious to the court at the time. I look at page 435 and 437 of the government's appendix, which is part of the transcript of the hearing on the Rule 35a proceeding in this case. And counsel even said, and I quote, the fact that we don't have the evidence in the record today that there was a fraud on the court, we don't have the evidence that there were stealing transactions prior with the same investors. He admitted to the district court, even after the sentencing, that there was, in fact, no evidence in the record of any of the things that he is claiming here today. And, in fact, Your Honors, if you do, in fact, look at the affidavit that his client, unsupported affidavit that his client offered during the course of the Rule 35a proceedings, you see not an admission or even an allegation that this, that his client was involved in, with these investors in prior stole-y transactions, but rather that they may have been aware of life settlement or involved in life settlement transactions, which are a completely legal permissible transaction. This case is not about that. This case is about fraud. This case is about lying to insurance companies to get policies issued so they can resell them and make a lot of money. There was no evidence here, Your Honors, put forth either prior to the time of sentencing that the district court would even have been aware of, or after sentencing, when he had this opportunity, the court gave him in a Rule 35 proceeding, even though Rule 35 didn't even contemplate this, gave the defendant an opportunity to be heard and still could come up with nothing that would support his allegations either of ineffective assistance of counsel or of prosecutorial misconduct. And finally, Your Honors, I think just to correct something Mr. Hammer said, there were no promises made by the government here as to whether or not the investors would be treated as victims. All that happened here was that at the time of the plea, the government agreed that there was no actual loss in the plea agreement, however said that if that view changed, they would let the court know and let the defense know. Notwithstanding that reservation, notwithstanding the fact that the government had the ability to argue what we're now arguing, that is that these investors, the court properly found these investors were victims, the government nonetheless stood by what essentially was the understanding or the understanding that the defendant had from those plea negotiations and did not advance what we are arguing here today until the time of appeal. The government acted in the most conservative, in an abundance of caution and most conservative way in approaching any agreement. Would you remind me again what the calculation of the loss, the restitution that was ordered was about 1.9 million, is that right? That's right, Your Honor. Yeah. And that was, could you just remind me once again the history of getting to that? Sure, Your Honor. So the calculation of the loss had to do with the amount of money that the investors had put into this, less what they had been able to get back through the course of litigation with the insurance companies that was backed out of that. So it was not the full amount that the investors had put in, but I believe they've been able to recoup some of that through separate litigation. Your Honors, in short, I have nothing further to add unless there are questions from the bench. Thank you all very much. Mr. Hammer, you have some rebuttal time. Yes, thank you for the three minutes. In regards to the statement that we don't have the evidence, we went to a hearing on the Rule 35A motion. The court was about to take the thirty-day leave, and I said, why don't we use this time to supplement the record, to bring in these facts? It certainly wasn't, we have no evidence. It was an attempt to supplement the record. In regards to the promise, we all know that a plea agreement is a contract. We know it's strictly construed against the government. We know that in the stipulated facts, which is binding the government, there was only one victim mentioned, the insurance companies, not the investors, and that . . . I believe it is, Your Honor, from memory. Is that the section on premium financing in the life settlement industry? Yes, and these are code words, because premium financing . . . I mean, this all started with a hate . . . Why would he use code words in his . . . why wouldn't he just spell it out in his affidavit? Well, I think it's fairly clear that we're talking about premium financing, meaning STOLE policies and their expertise going back to 2003. It could have been more on the nose, but it was written . . . What he said, even assuming that premium financing is the same thing as STOLE policies, what the affidavit says is that these people had meetings in the past where this kind of thing was explained to them. It never said that they invested in that kind of policy in the past, and it never says that he told them that these policies were that kind of policy. Is that not correct? That is correct, but the other issue is their knowledge, because . . . Well, if he had knowledge of what they knew, because he participated in all of this, isn't he the one who could say either I told them about these policies, which he does not say, or that they had not just gone to some seminar talking about this, but had invested in it? In fact, wouldn't their previous knowledge of this explain why one of them says, by the way, the Delaware Supreme Court has said that kind of policy is illegal? Are these that kind of policy to which he says no? I agree with you that it could have been clear in the affidavit, and the affidavit was a starting point two days after. I do agree with you, but remember, Your Honor, we're talking about knowledge, because in their toxic letters, they're saying really stolly, virgins. We don't know anything. We signed pieces of paper in blank. I mean, it's a little bit of a stretch not to say they had no knowledge. Does your client in his affidavit deny those assertions? Could you . . . For example, you said they claimed falsely that they signed papers in blank. Does your client say no, nothing like that ever happened? No, he doesn't. He doesn't. I think it's an inference that is strong and unrebutted, and I think that's an important point as well. As far as, Your Honor, the question about loss calculation, the 20-point increase in the guideline sentence is so disproportionate. It's 20 . . . That's exactly what the district court said, right? The district court said this is so out of whack. I'm not even going to look at that. He didn't say, well, the guidelines come in a little high, but I think I'm going to go lower. He said, I'm going to disregard that entirely, and instead I'm going to focus the sentence on the amount of your client's gain rather than on anything to do with the loss calculation. That's what he thought was a fair sentence. Is there any basis at all to think that the judge was somehow influenced by the loss calculation that you attack, putting aside whether it was correct or not? Yes, because the gain of $272,000 is level 12, not level 20, and the court departed downward significantly for other reasons, for 3553A reasons. The difference between the 20-point increase, which is in the Binday and the Jenkins issue of these Stolle Factories with these really horrible people . . . I mean, we're only talking about three policies here. How do you get an increase of 20 points? And if something is disproportionate, the law in the circuit is on the disproportionate effect of a guideline sentence, the government really should establish by clearing . . . This was the whole sentence. What was not the sentence based on the amount of the gain? No. No. It couldn't be, because the amount of the gain would only come in plus 12. The amount of the sentence, the judge said it. He said the fraud was the face value of the policies. We can't anchor a loss calculation to the face value of the policy. What about the sentence that was imposed? Was the sentence that was imposed not the equivalent, not within the range that was based on the amount of the gain? I really disagree, because . . . Was it? It's a factual question, right? If you take the amount of the gain and calculate a sentencing guideline, you get 30 to 37 months. The sentence here was 36 months, correct? No, I disagree. The gain was only level 12, an increase, as opposed to level 20. And what would . . . The gain of . . . Excuse me. Yes, sir. What would the guideline be if you took the amount of the gain? The guideline would be about 12 months, because the $272,000, as opposed to the $14 million, is not a 20-point increase. It's a 12. Not only that, Mr. Cortello was bumped up two points for the victim taking advantage of these victims. And if these victims are not really victims, on remand, this case, I'm saying in good faith, would come in at a guideline of well under this 20-point increase, and then we go from there. I mean, the judge came . . . Does your brief include a calculation of what you think the guideline would be? No, because I didn't want to make the same mistake as the government. The government came up with a formula that doesn't have any basis in fact or law or any of these small universes of Stoley. What I intended, and I said this to the judge, why don't you let Mr. . . . the government and I work together, bring in an expert, because under Binday, the only loss here, there was a gain all the way around by the insurance company, the only loss was the right of business control. That's the actual loss. There was no actual loss. There was a huge gain to the insurance company. The actual loss was zero, right? Yes. But the intended loss is what the probation department was focused on. They're wrong. The intended loss was based on the . . . Mr. Hammer, Mr. Hammer, why don't you finish up? Okay. I just respectfully thank the Court for allowing me to be a guest in this case, honestly should be remanded. That formula has no basis in law.  Full reserve decision. Thanks. Thank you.